IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs November 18, 2014

## STATE OF TENNESSEE v. WILLARD V. FLEMING

**Appeal from the Criminal Court for Sullivan County**
**No. S57419     R. Jerry Beck, Judge**

**No. E2014-01137-CCA-R3-CD - Filed February 25, 2015**

A jury convicted the defendant, Willard V. Fleming, of facilitation of the sale of cocaine, a Class D felony; facilitation of keeping or maintaining a dwelling used for keeping or selling controlled substances, a Class E felony; and assault, a Class A misdemeanor. The defendant challenges the sufficiency of the evidence and denial of his motion to acquit, asserting that the co-defendant's testimony regarding the defendant's involvement was insufficiently corroborated; that there was no proof that drugs were present because only lay testimony supported the conclusion that the substance sold was cocaine; that the evidence was insufficient to prove that the defendant maintained the dwelling; and that the confidential informant's testimony did not establish the elements of assault. We conclude that the evidence was sufficient to support the verdicts, and we accordingly affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER, and TIMOTHY L. EASTER, JJ., joined.

Randall D. Fleming (at trial and on appeal) and Katherine L. Tranum (at trial), Kingsport, Tennessee, for the appellant, Willard V. Fleming.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; Barry Staubus, District Attorney General; and Josh Parsons, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTUAL AND PROCEDURAL HISTORY**

The defendant's convictions came about as the result of a controlled cocaine purchase during which the defendant's daughter discovered that the purchaser, a long-time friend, was wearing a wire. The police subsequently extricated the purchaser, a confidential informant who told law enforcement that the defendant had pointed a gun at him after the wire was discovered. The defendant and his daughter were charged in a four-count indictment which alleged that both had committed the offenses of sale of cocaine and maintaining a dwelling which is used for keeping and selling controlled substances; the indictment further charged the defendant with aggravated assault and his daughter with destruction of evidence. At trial, the State presented the reluctant testimony of the confidential informant and the reluctant testimony of the defendant's daughter. The testimony of law enforcement and a video recording of the transaction, in which the defendant was not visible, were also introduced.

Brian Puckett, the confidential informant, at first refused to testify. After the trial court summoned an attorney to advise Mr. Puckett, he agreed to give evidence. The trial court allowed the State to treat him as a hostile witness. Mr. Puckett stated that on October 7, 2009, he spoke to Terra Fleming, the defendant's daughter, on the phone and arranged to buy an "eight ball" of cocaine. Mr. Puckett testified that he was paid for his role in the controlled buy but that his real motivation was to regain custody of his son, who had been in the custody of the Department of Child Services since the arrest of the boy's mother. According to Mr. Puckett, prior to the purchase, Detective Cliff Ferguson wrote out a statement saying that law enforcement would assist Mr. Puckett in a custody hearing if he agreed to participate in the controlled buy. He testified that law enforcement reneged on this agreement and that his attempts to reach Detective Nathan Elliott on his cell phone prior to the custody hearing were unsuccessful.

Mr. Puckett testified that law enforcement put a wire on him and, following his directions, drove him to the defendant's home. Mr. Puckett knew that the defendant lived at that residence because Mr. Puckett had grown up with the defendant's daughter, Ms. Fleming, and because at the time, he was a friend of the family. Ms. Fleming met Mr. Puckett at the back door, and he gave her two hundred dollars. Mr. Puckett testified he could see the defendant sitting in the living room in a love seat or recliner. Ms. Fleming took the money, went in the house, returned, gave Mr. Puckett a hug, and felt the recording equipment. Mr. Puckett testified that he believed Ms. Fleming had the cocaine with her. Mr. Puckett initially testified that the cocaine was never placed in his hands; later, he testified that he did not remember if it was in his hand and that Ms. Fleming may have grabbed it from him.

After discovering the wire, Ms. Fleming tried to pull Mr. Puckett into the house, and

Mr. Puckett started repeating the agreed-upon code word for distress, "Mickey Mouse." He testified that when Ms. Fleming tried to pull him into the house, he saw the defendant coming through the hall from a recliner. On the video recording, Mr. Puckett could be heard to say the defendant was on the bed. When questioned about this statement, Mr. Puckett testified that it was false and that the defendant had been on the couch or recliner. Asked about the gun, he at first only testified that he recalled "seeing something." When pressed, he acknowledged that it was a firearm "of some sort" and that he had told police he was afraid the defendant would "blow [his] brains out" because "who wouldn't be." He nevertheless testified that the defendant did not intend to point the firearm at him and that the defendant did not, in fact, point the firearm at him. Mr. Puckett was secured by law enforcement and taken to the police station to complete a statement.

Mr. Puckett was impeached with the statement he had signed on the night of the purchase and which he essentially repudiated at trial. Mr. Puckett testified that the statement was not written by him but by the officer who took it, that he felt had no choice but to sign in order to get custody of his son, and that the officer "put words in [his] mouth." Mr. Puckett denied some material facts asserted in the statement, including that he set up the transaction with the defendant instead of Ms. Fleming; that the defendant came to the door and gave Ms. Fleming the cocaine so she could, in turn, give it to him; and that the defendant pointed a gun at him. Although the trial court determined after a jury-out hearing that Mr. Puckett's signed statement should only be allowed as impeachment, the defense later asked that it be made an exhibit. At the time that the statement was entered as an exhibit, the trial court reiterated its instructions that a witness's prior statement could only be considered for impeachment. Mr. Puckett had a conviction for shoplifting.

Ms. Fleming, the defendant's daughter and co-defendant, testified that she did not want to appear as a witness against her father. Ms. Fleming stated that she, her father, and her father's girlfriend lived at the residence. Ms. Fleming and her family had lived there "[s]ince [she] was little." Ms. Fleming had also been a friend of Mr. Puckett since they "were little kids." Ms. Fleming testified that she did not make arrangements to sell Mr. Puckett cocaine, that she in fact had only been home a few minutes when he arrived, and that she had not had a phone with which to speak to him. While Ms. Fleming testified that she was promised probation in exchange for her testimony, she later clarified that she had already pled guilty and been sentenced to probation and that there was no express plea agreement in place, but rather an understanding that there was a chance she would be called to testify.

Ms. Fleming confirmed that Mr. Puckett gave her about two hundred dollars for cocaine. After watching the video, she recalled that he initially gave her one hundred eighty dollars and that she had to ask him for the last twenty dollars. She testified that the cocaine was in her father's room, in his dresser; however, she did not get it from the dresser but

directly from her father, who was "probably" sitting on his bed. She testified that when she went back into the house after receiving the money, she walked a few steps to her father's room. He gave her the cocaine, which was already in a bag. She did not remember if she told her father how much Mr. Puckett wished to purchase. She did not see scales or more than one bag. Ms. Fleming testified she assumed it was an "eight ball," which is a little over three grams, because of the price. She testified that she then gave the cocaine to Mr. Puckett and hugged him. She felt a box in his pants and then a cable coming up his back. When she felt the cable, he started saying, "Mickey Mouse."

Ms. Fleming testified that they scuffled and that Mr. Puckett punched her in the face with a closed fist. She called for her father because Mr. Puckett hit her and not because of her concern for the failed drug sale. Ms. Fleming testified that she never saw the defendant in possession of anything that looked like a gun; there was a BB gun in the house belonging to the defendant's girlfriend, but Ms. Fleming had not seen it in months. The defendant's girlfriend was present during the incident and could be seen on the video. Ms. Fleming testified that she did not give the money to her father and that she did not know what became of it. She testified that she flushed the cocaine down the toilet. Ms. Fleming acknowledged that she had initially told police that she did not destroy the evidence. She changed her mind and told the truth when police told her she would be charged with attempted second degree murder.

Four police detectives, Scott Reid, Cliff Ferguson, Nathan Elliott, and Steve Summey, testified regarding the drug sale. While Detectives Reid, Ferguson, and Elliott were present during the preparation of Mr. Puckett, all of them claimed not to be his "handler" as a confidential informant. This was Mr. Puckett's first time to work as a confidential informant, and Mr. Puckett arrived at the station having already arranged the purchase. Detective Ferguson acknowledged having filled out the paperwork detailing the department's agreement with Mr. Puckett immediately before the arranged purchase, but he testified in a hearing outside the presence of the jury that a "handler" was generally assigned later and that he had not been assigned to Mr. Puckett. The detectives testified that there was no agreement in place regarding a custody hearing. Detective Elliott gave Mr. Puckett two hundred dollars of photocopied money for the purchase. Detective Reid drove Mr. Puckett to the residence while the other three followed in a separate car and parked a few doors down.

Detective Reid did not have any way of knowing what happened once Mr. Puckett left the car, but the other three monitored the transaction via audio. When they heard the distress code, they rushed to the back porch. Detective Summey testified that he was the first one behind the house and that he saw a male and female run into the house and slam the door. The other officers saw only Mr. Puckett. The officers retrieved Mr. Puckett, who had no drugs or money on his person, and Detective Reid drove him to the station, where he gave

-4-

a statement. Mr. Puckett was paid, although none of the officers recalled paying him.

The defendant, Ms. Fleming, and the defendant's girlfriend remained in the house. Detective Elliott left to secure a warrant for the premises, naming Ms. Fleming as the subject of the search. Detective Summey testified that a negotiator spoke with the three occupants on the phone and that they eventually came out of the residence around one-and-a-half or two hours later. Detective Ferguson testified that they were in the residence about one hour. Officers then searched the home for around one hour. Detective Summey testified that the home was very cluttered, to the point that it was difficult to walk through. The photocopied money used in the purchase was not recovered, and neither were any drugs or drug paraphernalia. Detective Summey testified that he looked inside a washing machine as part of the search. The machine contained standing water and a comforter. Under the comforter, he found a black pistol which appeared to be a real firearm but was later determined to be a pellet or cap pistol.

The video of the transaction was played in court numerous times. The video shows that Mr. Puckett entered the residence's back porch and knocked on the back door. Ms. Fleming answered the door and asked the defendant what he needed. Mr. Puckett answered, "An eight ball. Eight. Two hundred." After the money was counted and supplemented, Ms. Fleming held a bill up to the light. Mr. Puckett asked, "What's your dad into?" Ms. Fleming went briefly into the house, leaving the door open. Mr. Puckett stepped in the threshold so that the home's interior was briefly visible, and he called to some dogs inside. Ms. Fleming returned. The video does not capture an exchange of drugs or the hug that both Ms. Fleming and Mr. Puckett testified occurred. The video shows that shortly after Ms. Fleming's return, while she was standing close to Mr. Puckett, Mr. Puckett said, "Mickey Mouse," and Ms. Fleming began to call for her father and to plead, "Brian, please don't do this to me." The camera was obscured as Mr. Puckett fell and continued to say the distress code. After police extricated him, Mr. Puckett stated, "This … is worth more than $100 …. I about got my teeth bl[own] in." He elaborated that someone had "pulled a gun on me." He further told police that "they got the dope out of my hand." Mr. Puckett stated, "He came outside. . . . He's back there on the bed." On the video, Mr. Puckett can be heard to observe, "I better get my son back."

At the close of the State's proof, the trial court granted the defendant's motion of acquittal with respect to the aggravated assault charge, concluding pursuant to *State v. McGouey*, 229 S.W.3d 668, 674 (Tenn. 2007) that the evidence was not sufficient to show that a deadly weapon was used. The jury was charged to consider the lesser-included offense of assault. The jury convicted the defendant of the facilitation of the sale of cocaine; of the facilitation of keeping or maintaining a dwelling where drugs are kept or sold; and of misdemeanor assault, and it imposed a three-hundred-dollar fine for each of the felony

convictions. The defendant, who was out on bond, did not appear at sentencing and was sentenced in absentia. The trial court sentenced the defendant as a persistent offender to eight years' confinement for the facilitation of the sale of cocaine; to four years' confinement for the facilitation of keeping or maintaining a dwelling where drugs are kept or sold; and to eleven months and twenty-nine days for the assault conviction, all to be served concurrently. The defendant was subsequently apprehended. On appeal, he challenges the sufficiency of the evidence.

**ANALYSIS**

**I. Sufficiency of the Evidence and Motion for Judgment of Acquittal**

Tennessee Rule of Appellate Procedure 13(e) requires a finding of guilt to be set aside if the evidence is insufficient to support the finding beyond a reasonable doubt. When a court evaluates the sufficiency of the evidence, it must determine whether, after considering the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999). This Court neither reweighs nor reevaluates the evidence, nor may it substitute its inferences for those drawn by the trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *Id.* The appellate court affords the prosecution the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from it. *State v. Pope*, 427 S.W.3d 363, 368 (Tenn. 2013). A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, and on appeal the defendant bears the burden of showing why the evidence is insufficient to support the jury's verdict. *State v. Franklin*, 308 S.W.3d 799, 825 (Tenn. 2010). Circumstantial evidence is sufficient to support a conviction, and – contrary to the defendant's claim – "the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012).

The defendant asks us to separately consider whether the trial court erred insofar as it denied his Rule 29 motion for judgment of acquittal. In deciding a motion for judgment of acquittal, the trial court is concerned with the legal sufficiency of the evidence. *State v. Collier*, 411 S.W.3d 886, 892 (Tenn. 2013). "The standard by which the trial court determines a motion for a judgment of acquittal is, in essence, the same standard that applies on appeal in determining the sufficiency of the evidence after a conviction." *State v. Little*, 402 S.W.3d 202, 211 (Tenn. 2013). A distinction arises between a challenge to the sufficiency of the convicting evidence and a challenge to the trial court's denial of a motion

to acquit in a circumstance in which the defendant introduces proof after the State rests its case. A motion for judgment of acquittal is waived if the defendant introduces proof after making the motion. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007). When the defendant does not stand on a motion for judgment of acquittal, the appellate court may then consider evidence introduced after the close of the State's case-in-chief in assessing the sufficiency of the evidence. *See id.* at 314, 316-17. In this case, the defendant introduced no proof after the State rested its case. Accordingly, both challenges are to the sufficiency of the State's evidence at the close of its case, and we do not address them separately.

## A. Corroboration of Co-Defendant's Testimony

The defendant asserts that his convictions for facilitation of the sale of cocaine and facilitation of the maintenance of a dwelling used for keeping or selling controlled substances both depend on the uncorroborated testimony of his co-defendant and daughter, Ms. Fleming. Accordingly, he challenges the sufficiency of the evidence supporting these convictions on the basis that an accomplice's testimony must be corroborated.

Evidence is insufficient to sustain a verdict when it is based solely on the uncorroborated testimony of an accomplice. *State v. Henry Lee Jones*, __ S.W.3d __, No. W2009-01655-SC-DDT-DD, 2014 WL 4748118, at *18 (Tenn. Sept. 25, 2014). An accomplice is "one who knowingly, voluntarily, and with common intent with the principal unites in the commission of a crime"; a witness is an accomplice if he or she could be indicted for the same offense charged against the defendant. *Collier*, 411 S.W.3d at 894. "Corroborative evidence must lead to the inferences that a crime has been committed and that the defendant is implicated in the crime." *Henry Lee Jones*, 2014 WL 4748118, at *18. The corroborative evidence may be direct or circumstantial and need not be adequate to support the conviction alone. *State v. Bane*, 57 S.W.3d 411, 419 (Tenn. 2001). "[I]t is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged." *Id.* (quoting *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994) (emphasis omitted)).

Ms. Fleming, who was a co-defendant on the two charges challenged on the basis of inadequate corroboration and who pled guilty to these crimes, was the defendant's accomplice. Accordingly, the State had to introduce evidence corroborating her testimony that the defendant facilitated the commission of these crimes.

Ms. Fleming testified that she did not arrange the purchase of cocaine with Mr. Puckett. According to her testimony, after Mr. Puckett gave her the money, she went into the house, walked a few steps to her father's bedroom, and her father handed her the pre-packaged cocaine that had been in his dresser. She then stepped out and delivered it to Mr.

Puckett. The testimony of Mr. Puckett, as well as the video of the transaction, corroborate Ms. Fleming's testimony that a sale of cocaine occurred.

We also conclude that the corroborative evidence connecting the defendant to the crime is sufficient to sustain the verdict. Ms. Fleming's testimony that she did not set up the purchase is corroborated by the fact that she asked Mr. Puckett what he needed when she answered the door and by the fact that Mr. Puckett told her both the quantity and price of the cocaine. Ms. Fleming's testimony that the defendant handed her the cocaine while sitting on his bed is corroborated by Mr. Puckett's statement, audible on the recording, that the defendant was on the bed. Mr. Puckett also testified that when the door was open, he could see the defendant in the house, albeit on the recliner according to his testimony. The defendant's involvement is also corroborated by Ms. Fleming's action in immediately calling for him when she discovered the recording equipment. Furthermore, Mr. Puckett testified that the defendant approached him with what appeared to be a handgun immediately after the discovery of the wire. Detective Summey saw a male flee into the house as he came around the corner, and the defendant, along with his girlfriend and daughter, refused to come out of the dwelling for over an hour after the arrival of the police. While not sufficient to sustain the conviction in itself, this evidence corroborates the accomplice's testimony in that it "fairly and legitimately tends to connect the defendant with the commission of the crime charged." *Bane*, 57 S.W.3d at 419 (quoting *Bigbee*, 885 S.W.2d at 803).

The defendant was also convicted of the facilitation of knowingly keeping or maintaining a dwelling that is used for keeping or selling controlled substances. T.C.A. § 53-11-401(a)(5) (2010). Ms. Fleming, the defendant's daughter and accomplice, testified that she and the defendant had lived in the house since she was little. She acknowledged selling drugs there. The video of the transaction, in which the confidential informant asks for an "eight ball" and gives Ms. Fleming two hundred dollars, as well as the confidential informant's testimony and statements in the video that he received cocaine are sufficient to corroborate the element that the dwelling was used for keeping or selling controlled substances. Furthermore, the confidential informant's testimony that he had known the defendant and Ms. Fleming to live at that address and that he was a longtime friend of the family corroborate Ms. Fleming's testimony tending to connect the defendant with the crime charged.[1]

**B. Ownership of the Dwelling**

---

[1] The defendant also challenges the sufficiency of the State's evidence on the keeping or maintaining of the dwelling, and we address the issue below.

The defendant challenges his conviction for facilitation of keeping and maintaining a dwelling used for keeping or selling controlled substances. The defendant asserts that the State's evidence was not sufficient to support the jury's conclusion that he facilitated the maintenance of the dwelling in question because the State did not introduce a lease or other documents establishing the ownership of the property and because the search warrant only named Ms. Fleming.

Tennessee Code Annotated makes it a crime:

> Knowingly to keep or maintain any store, shop, warehouse, dwelling, building, vehicle, boat, aircraft or other structure or place that is resorted to by persons using controlled substances in violation of part 3 of this chapter and this part, or title 39, chapter 17, part 4, for the purpose of using these substances, or that is used for keeping or selling them in violation of part 3 of this chapter and this part, or title 39, chapter 17, part 4.

T.C.A. § 53-11-401(a)(5). There was no evidence at trial that the home was resorted to for the purpose of using controlled substances. Accordingly, the State had to show that the defendant facilitated the keeping or maintenance of a dwelling used for keeping or selling controlled substances and that he acted knowingly. In examining this statute, this Court has previously defined "keep" to mean "to watch over and defend," "to have the care of," or "to cause to remain in a given place, situation, or condition," and "maintain" to mean "preserve from failure or decline" or "carry on." *State v. Laura Starkey*, No. M2005-02896-CCA-R3-CD, 2007 WL 1266581, at *5 (Tenn. Crim. App. May 2, 2007), *perm. app. denied* (Tenn. Aug. 27, 2007) (quoting Webster's Third New International Dictionary 1235 (1993)). Facilitation occurs when "knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." T.C.A. § 39-11-403(a).

For the State to show that a person kept or maintained or facilitated the keeping or maintenance of a dwelling in violation of the statute, evidence of ownership is not required. *Laura Starkey*, 2007 WL 1266581, at *5. Instead, the State must prove that "the person continuously exercised some authority or control over the property for an appreciable period of time." *Id.* Evidence of residency or ownership is relevant to the inquiry:

> While proof of residency is a significant factor to consider, that factor alone is not dispositive. Other factors that may be

considered include whether the person owned or leased the property; is the only permanent resident in the home; paid any rent, taxes, or utilities; took part in the home's maintenance or upkeep; or provided furnishings for the home.

*State v. Jawaune Massey*, No. E2013-01047-CCA-R3-CD, 2014 WL 3661490, at *26 (Tenn. Crim. App. July 23, 2014) (quoting *Laura Starkey*, 2007 WL 1266581, at *5).

In *Laura Starkey*, this Court concluded that the evidence was insufficient to show maintenance by a co-defendant who was not shown to pay rent or other expenses, take part in the home's upkeep, have furnishings in the home, or have general control over the property. *Laura Starkey*, 2007 WL 1266581, at *6. The court noted, however, that if evidence had been introduced that she was involved in the home's upkeep by cooking and cleaning, the evidence likely would have been sufficient. *Id.* at *6 n.1. Although another defendant in *Laura Starkey* likewise was not shown to have contributed financially or otherwise to the home's maintenance, the court nevertheless concluded that the evidence was sufficient to support his conviction based on the fact that he exercised authority over the house by allowing a police search, telling the co-defendant whether or not she could come home, and acknowledging he had allowed the manufacture of methamphetamine. *Id.* at *6 (reversing conviction on other grounds); *see also Jawaune Massey*, 2014 WL 3661490, at *26-27 (concluding that the proof did not show that the defendant contributed financially or otherwise in the upkeep of the house or exercised control over the premises for an appreciable time, when testimony showed that the defendant may have lived in the house for a short period of time but had since moved to an apartment); *State v. James Simonton*, No. E2006-01529-CCA-R3-CD, 2007 WL 3379791, at *10-11 (Tenn. Crim. App. Nov. 15, 2007) (concluding that a defendant who did not own, rent, or contribute to property belonging to his brother nevertheless maintained or kept it by occupying it and exercising supervisory control, as shown by giving consent to a search).

Here, Ms. Fleming testified that she and her family had lived at the house "[s]ince [she] was little." Mr. Puckett also testified that, as a long-time friend of the family, he knew the defendant to live at the dwelling. A woman appearing on the video recording was identified by Ms. Fleming as the defendant's girlfriend, who was also staying at the house. The jury was free to draw the rational inference that the defendant, who had resided in the dwelling since his adult daughter "was little" and who allowed his girlfriend to come to the home, had "continuously exercised some authority or control over the property for an appreciable period of time." *Laura Starkey*, 2007 WL 1266581, at *5. Furthermore, the evidence was sufficient to show that Ms. Fleming, who had lived at the residence since she was "little" and who answered the door and allowed Mr. Puckett to step in and call to the dogs, likewise continuously exercise control over the property for an appreciable time.

Accordingly, we conclude that, despite the fact that the ownership of the property was not established by proof at trial, the evidence was sufficient to show that the defendant "knowingly furnishe[d] substantial assistance" to his daughter in the keeping or maintenance of the dwelling, which the proof at trial established was used to keep or sell controlled substances. T.C.A. § 39-11-403(a); *see also State v. Elmer Herbert Simpson*, No. E2013-02336-CCA-R3-CD, 2014 WL 3827672, at *4 (Tenn. Crim. App. Aug. 5, 2014) (concluding that evidence that defendant had stolen pills from his sister and had offered to sell them from his home to an associate was sufficient to sustain the conviction); *State v. John Anthony Garrett*, No. E2012-01898-CCA-R3-CD, 2013 WL 5373156, at *1 (Tenn. Crim. App. Sept. 23, 2013) (upholding guilty plea for defendant who sold cocaine to a confidential informant during one controlled purchase).

### C. Lay Testimony Establishing Presence of Cocaine

The defendant next challenges the sufficiency of the evidence based on the claim that lay testimony from the defendant's daughter is not sufficient to establish that the substance sold to Mr. Puckett was cocaine. Because the evidence was destroyed, no lab reports or testimony from trained law enforcement officers was introduced to establish that the substance was cocaine.

Several Tennessee cases have permitted law enforcement officials to testify to the presence of drugs without corroborating lab work, particularly when such testimony was supported by field tests or other evidence. In *State v. Anderson*, the court upheld a conviction based on the testimony of an officer who was permitted to testify that a substance was marijuana based on appearance and on a field test. *State v. Anderson*, 644 S.W.2d 423, 424 (Tenn. Crim. App. 1982). Likewise, the testimony of an officer who had conducted a field test which was positive for marijuana was sufficient to prove that the plant substance was marijuana. *State v. Hill*, 638 S.W.2d 827, 830 (Tenn. Crim. App. 1982). In *State v. Doelman*, a field of marijuana was never chemically tested, but several officers with training in marijuana recognition testified that the plants were marijuana, and photographs of the field and confessions from the defendants were introduced. *State v. Doelman* 620 S.W.2d 96, 98, 99 (Tenn. Crim. App. 1981). The court held that the evidence was sufficient to uphold the verdict and that the officers' testimony was properly admitted. *Id.* at 98, 99.

Recently, in *State v. White*, the Tennessee Supreme Court concluded that the testimony of a law enforcement officer that a substance was marijuana was sufficient to support the conviction even though it was not corroborated by field testing, a confession, or the presence of drug paraphernalia. *State v. White*, 269 S.W.3d 903, 906 -07 (Tenn. 2008). In *White*, the court concluded that the jury could have rationally concluded the substance was marijuana from the officer's testimony, from the evidence that the defendant was under the

influence, and from inferences drawn from the defendant's refusal to submit to drug testing. *Id.* at 907. *See also State v. Toussiant D. Turner*, No. 01C01-9901-CC-00007, 1999 WL 787526, at *2 -3 (Tenn. Crim. App. 1999) (allowing investigator to testify that a substance which was carried from an apartment where drugs were sold in a bag containing a weapon and large amount of cash appeared to be crack cocaine despite absence of lab report); *State v. Randy Bowman*, No. 01-C-01-9008-CR00211, 1991 WL 36511, at *1-2 (Tenn. Crim. App. Mar. 21, 1991) (concluding that an experienced officer's opinion that a substance was marijuana was sufficient to sustain conviction when the State neglected to introduce a stipulation regarding the lab report). *Compare State v. Marise*, 197 S.W.3d 762, 766 (Tenn. 2006) (concluding that the prior version of the statute, which made the chemical composition of anhydrous ammonia an element of the crime, required the State to introduce chemical test to prove the composition of the substance).

The defendant seeks to distinguish *Doelman* by noting that Ms. Fleming was not a law enforcement officer and that she had no training in drug detection. However, our cases have not limited testimony regarding the presence of drugs to law enforcement officers. In *State v. Pack*, the only direct evidence offered by the State that a substance was methamphetamine was the testimony of a witness who stated that he saw the defendant prepare the drug and that he was familiar with the drug because he had injected it before. *State v. Pack*, 421 S.W.3d 629, 639 (Tenn. Crim. App. 2013). The court concluded that the rational inference to be drawn from the witness's testimony that the defendant mixed the substance in a teaspoon and prepared it for injection, as well as the defendant's statement that the group was "doing dope," was that the substance was methamphetamine. *Id.*; *see State v. Noura Jackson,* No. W2009-01709-CCA-R3-CD, 2012 WL 6115084, at *35 (Tenn. Crim. App. Dec. 10, 2012) (allowing lay witnesses to testify that the defendant used drugs in their presence) *overruled on other grounds in State v. Jackson*, 444 S.W.3d 554 (Tenn. 2014).

*State v. Peter Gunn* presents a situation, like the case at bar, in which the evidence was not tested because it was destroyed. *State v. Peter Gunn*, No. 02C01-9511-CR-00352, 1996 WL 551757, at *1-2 (Tenn. Crim. App. Sept. 30, 1996). In *Peter Gunn*, a law enforcement officer told the defendant he wished to purchase crack cocaine. The defendant approached the co-defendant, who gave him "something." *Id.* at *1. The defendant then received the money from the officer and gave the substance, which appeared to be crack cocaine, to the officer. *Id.* However, when the defendant saw the approach of uniformed officers, he destroyed the evidence by swallowing it. *Id.* The co-defendant was found to possess crack but denied giving any to the defendant that day. *Id.* *2. In concluding the evidence was sufficient to sustain the conviction, this Court noted that, in addition to the other direct and circumstantial evidence supporting the conclusion that the substance was cocaine, "the jury could have inferred … a consciousness of guilt" from the defendant's act of swallowing the evidence. *Id.* *2.

Here, Mr. Puckett testified that he arranged to buy cocaine at the defendant's residence. According to the video and the testimony of Mr. Puckett and Ms. Fleming, he arrived at the porch and gave Ms. Fleming two hundred dollars for an "eight ball," which Ms. Fleming testified was a little over three grams of cocaine. Ms. Fleming testified that she retrieved cocaine from the defendant and that she gave it to Mr. Puckett. Mr. Puckett testified both that the cocaine was not in his hands and that he did not remember if it was in his hand and that Ms. Fleming may have grabbed it. In the video, Mr. Puckett tells officers that "they got the dope out of my hand." After the arrival of police, Ms. Fleming, the defendant, and the defendant's girlfriend fled into the house. Ms. Fleming acknowledged that she flushed the cocaine down the toilet. The three remained in the house for between one and two hours before a negotiator convinced them to come out.

We conclude that the evidence is sufficient to support the jury's conclusion that the substance was cocaine. Although Ms. Fleming was not a law enforcement officer with training in the identification of drugs, she was in possession of the substance, was selling the substance, and testified that the substance she was selling was cocaine. Mr. Puckett paid Ms. Fleming two hundred dollars. When he paid, he asked for an "eight ball." After the arrival of police, Ms. Fleming destroyed the evidence. The jury was entitled to credit Ms. Fleming's testimony that the substance she was giving Mr. Puckett was cocaine and to draw the rational inference that the substance was cocaine from Ms. Fleming's actions of accepting two hundred dollars for the substance, of representing to Mr. Puckett that the substance was cocaine, and of destroying it on the arrival of police. The evidence was sufficient to support the conclusion that the substance was cocaine even without a laboratory test, which was made impossible by the co-defendant's destruction of the evidence.

### D. Assault

The defendant further claims that the evidence was not sufficient to establish that the defendant assaulted Mr. Puckett with the BB gun. Assault, as charged in this case, is committed when the offender intentionally or knowingly causes another to reasonably fear imminent bodily injury. T.C.A. § 39-13-101(a)(2). The defendant cites to Mr. Puckett's equivocal testimony that he saw the defendant holding "something" and Ms. Fleming's testimony that the defendant's girlfriend had a BB gun but that she had not seen the gun in months. However, looking at the evidence in the light most favorable to the State, we conclude that the evidence is sufficient to support the conviction. In addition to stating that he saw the defendant holding "something," Mr. Puckett testified that he saw the defendant with what appeared to be a firearm. He acknowledged having said he was afraid the defendant would "blow [his] brains out." In agreeing that he was afraid, Mr. Puckett stated, "who wouldn't be[?]" The video shows Mr. Puckett telling police, "I about got my teeth bl[own] in," and stating that a gun was "pulled … on me." When searching the home,

Detective Summey found a black BB gun which resembled a Glock pistol and which he initially thought might be an actual firearm. The gun was in a washing machine by the back entrance of the house, and it was submerged in standing water under a comforter. While Ms. Fleming testified that the defendant did not have a gun and while Mr. Puckett's trial testimony was equivocal, the jury was entitled to credit those parts of Mr. Puckett's testimony which supported the conclusion that the defendant threatened him with a BB gun, and it was entitled to draw the rational inference that the BB gun was not normally stored in standing water in a washing machine but had been put there for purposes of concealment after it was used to threaten Mr. Puckett. The defendant is not entitled to any relief as to this issue.

## CONCLUSION

Based on the foregoing, we conclude that the evidence is sufficient to sustain the verdicts, and we affirm the judgment of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE

-14-